THE CITY OF CHICAGO *et al.*

*v.*

JOSEPH MOHR.

*Opinion filed June 23, 1905.*

1. MUNICIPAL CORPORATIONS—*permitting a sealed bid to be changed after opening is improper.* Permitting a sealed bid upon public work to be materially changed after it has been opened by the proper authorities is in violation of the purpose and intent of the law.

2. SAME—*when change in bid is material.* Permitting a bidder on public work, after his bid had been opened, to agree to install three feed water-purifiers in addition to the three specified in his bid, and to agree to complete the work in much less time than he had specified, time having been made an essential element of each bid and a bonus offered for each day gained on the time specified, amounts to a material change in the bid and destroys competition.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. EDWIN O. BROWN, Judge, presiding.

WILLIAM D. BARGE, (EDGAR BRONSON TOLMAN, Corporation Counsel, of counsel,) for appellants the city of Chicago and Frederick W. Blocki.

JAS. J. BARBOUR, for appellant the S. Freeman & Sons Manufacturing Company.

RUBENS, DUPUY & FISCHER, (GEORGE A. DUPUY, of counsel,) for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The appellee filed a bill in chancery in the circuit court of Cook county for a decree restraining the city of Chicago from entering into or executing any contracts for the construction of a new boiler plant at the Fourteenth street pumping station of the Chicago water-works, and from taking any steps to carry out such contract or paying out any moneys on account thereof.

The amended bill, upon which the case was tried, alleges that the complainant is (*a*) the owner of taxable property in the city, and (*b*) a contributor to the city water rates and a water-rate payer. It alleges that the city is incorporated under the "Act to provide for the incorporation of cities and villages," approved April 10, 1872, and that the laws of the State now in force in regard to the letting of contracts by a city are embraced in that act, and require that any public works, when the cost thereof shall exceed $500, shall be let to the lowest responsible bidder in the manner prescribed by the ordinance; that the ordinances of the city required that "when any public improvement shall be ordered by the city council, * * * a plan or profile of the work to be done, accompanied with specifications for the doing of the same, shall be first placed on file in the office of said department [of public works] before any such advertisement shall be made, which said plan, profile and specifications shall at all times be open for inspection. * * * All contracts exceeding in

216—21

amount the sum of $500 for work, materials or supplies, relating to any of the matters under the cognizance of the department of public works, shall be let by the commissioner of public works to the lowest reliable and responsible bidder or bidders whose bid does not exceed the estimate;" that the bidding should be by sealed bids and should be opened at an hour designated in the notice.

The bill also alleges that the city had determined to construct a new steam boiler plant at the Fourteenth street station and the commissioner of public works had undertaken to prepare plans and specifications for the work, copies of which are attached to the bill, but it is alleged that there was no plan or profile prepared as is required by section 1612 of the ordinance; that the plans and specifications were informal, insufficient and incomplete; that the specifications contained a clause providing for a comparison of bids, which required all bidders to submit detailed plans, drawings and specifications of the boilers, stokers, coal-conveyor plant, ash-bins, coal-bins, buckets, etc.; that the commissioner advertised for bids; that when the bids were opened they were found to be so widely variant that in order to pass upon them it was necessary to make a comparison not only of the price, but in regard to a number of points; that the commissioner made a comparison on some points of supposed relative merit; that the bids were as follows: John Mohr & Sons, a corporation, $98,000; John O'Neil, $98,000; S. Freeman & Sons Manufacturing Company, of Racine, Wis., $95,000; Springfield Boiler Works, $126,000. It alleges that neither the advertisement nor the plans and specifications on file in commissioner's office furnished any full, definite or precise information of the work to be done, and that those bidding had no intelligent basis for their bids, and that the advertisement, plans and specifications did not meet the requirements of the law, and that there was no uniformity in relation to the work bid upon by the different bidders, and that it was

impossible for any person to arrive at any conclusion as to which bidder was the lowest responsible bidder without, or even by, comparing the work proposed to be undertaken as well as by comparing the prices, and that this plan of receiving bids destroys competitive bidding and fails to comply with the requirements of the statutes, ordinances and laws relating to the letting of contracts; that the plant was to consist of six boilers, arranged in three sets or batteries of two boilers to each battery. It alleges that the specifications require a feed water-purifier for each boiler, and that the bid submitted by the S. Freeman & Sons Manufacturing Company provided for but three instead of six purifiers, and that after the bids were opened Freeman undertook to supplement his bid and agreed to furnish six purifiers in all, and that by Freeman's action in leaving out three of the purifiers he was enabled to make his bid lower than it would otherwise have been, and thereby competition was destroyed, and Freeman did not bid upon the same work that Mohr bid upon.

Under the head of "Special and general requirements" in the specifications, appears the following, to-wit:

"*Time of installation*—As the time required for the installation of the boilers is an essential element of this contract, bidders will stipulate the length of time required by them to install the first battery after being duly notified in writing by the commissioner of public works that the existing battery of three boilers is ready for removal. They will also stipulate the length of time required for the removal of the old boilers and their appurtenances, and the installation, ready for operation, of the second battery, after proper notification has been given by the commissioner of public works to proceed with the work. Similarly, a time limit will be specified for the removal of the old boilers and the installation of the third battery. It is stipulated and agreed that the entire coal-conveying plant shall be complete and ready for operation within one week after the limit of time guaranteed for the installa-

tion of the third battery of boilers. This element of time, as guaranteed, will be taken into consideration in canvassing the bids. The work in the shops shall begin immediately after the signing of the contract. It is also stipulated and agreed that the work of installation of the plant called for by these specifications shall be begun immediately after due notice has been given in writing by the commissioner of public works that the contractor can proceed with his operations in the boiler room, and such work shall be continued in such order and manner as to secure the completion of the work to be done under this contract, and of each of the batteries, in the order and within the time specified by the contractor and made a part of this contract. Should the contractor neglect or refuse or fail to complete the successive parts of the work in the order or within the time guaranteed, then and in that event it is hereby understood and agreed that the city will deduct and retain out of such moneys as will be due or which may become due and payable to the contractor, the sum of $50 per day for each and every day that each battery is delayed in its completion beyond the specified time, such moneys to be taken and considered as liquidated damages which the city will sustain by reason of such default. If, in the event that the successive batteries shall be completely ready for firing in less time than that guaranteed, then the city agrees to pay the contractor as a reward $50 for each and every day that each battery is completed before the limit of time guaranteed."

The bill alleges that Freeman's bid provided that he would have the first battery of boilers in place within one hundred days after written notice to remove the present battery No. 1, and the second battery in place within one hundred and forty days after notice that present battery No. 2 can be removed, and the third battery in place within one hundred and eighty days after notice that present battery No. 3 can be removed; that after the bids were opened Freeman offered to deliver the first battery within one hundred days after notice,

the second battery in forty days after notice and the third battery in forty additional days, making a total of one hundred and eighty days for the completion of the work from the time notice is given to remove the first battery, and the bill alleges that this permitted a variation of the terms of the proposal and was destructive of competitive bidding. It is further alleged that the commissioner has accepted the bid of said Freeman company and is about to let the contract to it; that the action of the commissioner in permitting the Freeman company to amend its bid by providing six instead of three purifiers it should furnish, and changing the time in which the boilers should be installed, was illegal; that there has been no legal bidding for the work; that the plans and specifications were inadequate and insufficient to meet the requirements of the law; that the acts of the commissioner in advertising for bids are illegal and without warrant of law, and that any contract the commissioner may make with the said Freeman company will be illegal and void.

The S. Freeman & Sons Manufacturing Company answered separately, and alleged that the letting was advertised according to law and that its bid was and is the lowest and best. The joint and several answer of the city and the commissioner of public works denied that the letting was illegal; averred that all things were done according to law; that the proposed work would be part of its system of waterworks; that said system is its private property and that no part of the cost thereof is paid by taxation; that the entire cost of this work will be paid out of the receipts derived from the sale of water by the city to private consumers.

The chancellor, on a hearing, dismissed the bill for want of equity, but the Appellate Court, on appeal, reversed the decree of the chancellor and remanded the cause, with directions to the chancellor to enter a decree in accordance with the prayer of the bill. This is an appeal from the judgment of the Appellate Court.

We think the judgment of the Appellate Court should be affirmed. Section 1613 of the city ordinances requires that "in all cases the bids for doing any work or making any public improvement shall be sealed bids," and further provides that "said bids shall be opened at the hour and place mentioned" in the advertisement for the same; and section 1614 requires that all contracts exceeding in amount the sum of $500 should be let by the "commissioner of public works to the lowest reliable and responsible bidder or bidders whose bid does not exceed the estimate." Sealed bids were received, and thereafter the bid submitted by the Freeman company was permitted to be changed in two respects. Its bid as written and sealed by said Freeman company specified that it would furnish one feed water-purifier to each battery of two boilers, being in all three purifiers. After the bids were opened the Freeman company was allowed to so change its bid as that it would be required to furnish one feed water-purifier for each boiler, being six purifiers. The bid of the said Freeman company, as submitted and sealed and when opened, as to the matter of time in which the batteries were to be complete and ready for operation, contained the following: "The undersigned hereby proposes and agrees to have the first battery of boilers in place complete and ready for operation within one hundred (100) days after written notice has been given by the commissioner of public works to the contractor to remove present battery No. 1. The undersigned hereby proposes and agrees to have a second battery in place complete and ready for operation within one hundred and forty days after written notice has been given by the commissioner of public works that the present battery No. 2 can be removed or. . . . . . days after date of contract. The undersigned hereby proposes and agrees to have the third battery in place, complete and ready for operation, within one hundred and eighty days after written notice has been given by the commissioner of public works that the present battery

No. 3 can be removed, or......days after date of contract."
After the bids had been opened the Freeman company was
permitted to change its proposal as to the matter of time in
which it would complete the work, so that it would be com-
pelled to complete all work on the first two boilers, or first
battery, within one hundred days from the time it got notice
from the engineer's department of the city that it was ready
for the placing of the first two boilers, the "next two boilers
in forty days after such notice being received and the last
two boilers in an additional forty days from such notice,
making total time of one hundred and eighty days for the
completion of the work from the time that we get the first
notice for putting in the first two boilers, providing orders
are given immediately after the placing of the first two boil-
ers for the placing of the second two."

Each of these changes was material. The evidence dis-
closed that the cost of furnishing six feed water-purifiers
would be from $800 to $1500 more than to furnish three
purifiers as specified in the bid of the Freeman company.
The specifications declared that the time required for the in-
stallation of the boilers is an essential element of the con-
tract, and required that the bidders should, in their sealed
bids, stipulate the length of time in which they would install
the first, second and third batteries, respectively, and the spe-
cifications expressly advised bidders that the element of time,
as guaranteed by the bidders in the sealed bids, would be
taken into consideration in canvassing the bids and determin-
ing to whom the contract should be let, and provided that if
the contractor should fail to complete the successive parts of
the work within the times agreed the city would deduct from
the contract price due the contractor $50 per day for each
and every day that each battery is delayed in its completion
beyond the specified time, and that if the successive batteries
should be completed in less than the guaranteed time the city
would pay to the contractor a reward of $50 for each day the

same should be completed before the time agreed upon. It is thus apparent that not only was the element of time agreed to be an essential matter in the letting of the contract, but it was of greatest importance to the city as well as the contractor, for the reason that if he fell short of the time agreed upon he suffered a heavy forfeiture, whereas if his work was completed within less time he would receive a large bonus over the contract price.

We agree with the opinion expressed by the Appellate Court that "it was a clear violation of the law to permit the change in the bid of the Freeman company as to matter of time; that it is obvious that to allow the change of a bid in any material respect after the bids are open is a clear violation of the purpose, intent and spirit of the law, and opens the door for preferences and favoritism as between the different bidders, if not to the grossest frauds. When a bid is permitted to be changed it is no longer the sealed bid submitted in the first instance, and, to say the least, is favoritism, if not a fraud,—a direct violation of the law,—and cannot be too strongly condemned."

We would be quite content to rest this holding upon principle, but authorities in its support are not lacking. In *State* v. *Board of Commissioners,* 11 Neb. 484, *Beaver* v. *Trustees,* 19 Ohio St. 97, and *Boren* v. *Commissioners,* 21 id. 311, the question of the effect of permitting material changes to be made in the terms and conditions of sealed bids after the bids had been opened was considered and condemned as violative of correct principles of law and as rendering the bids invalid. The principle declared in all of these cases is, that the board or body who are empowered to open the sealed bids and award the contract had power, under the law, to accept or reject the bids as submitted and sealed, but that they had no power, after the bids were open, to permit material amendments or changes to be made in the terms or conditions of the bids; that the only proposals or bids which the law could

recognize were those which were made, sealed and filed within the time limited in the advertisement calling for bids. In *Beaver* v. *Trustees, supra,* it was said : "We do not intend to be understood as holding that a mistake in a proposal may not be rectified in case of mistake of fact and the requisite data for its rectification are both apparent upon the face of the proposal, as if, for instance, Beaver & Butt had expressly named in their proposal the items of hardware for doors and windows, with prices annexed, or if a mistake in their arithmetic was detected. In all such cases we think the mistake may and ought to be rectified. It would be but just to the bidder and would in no way contravene the provisions of the law." But as nothing in the case calls for the application of what was there said it is not important we should advert thereto.

It is true that in the bid of the Freeman company as sealed and submitted, the general statement is to be found that the company proposes to do the work according to the specifications of the city; but this general statement could not be held to control the specific and definite proposal to furnish but three purifiers. The time in which the work was to be completed was material and of the essence of the undertaking. The specifications so declared, and the assistant engineer, in a communication in writing to the superintendent of public works in which the recommendation was made that the bid of the Freeman company be accepted, called attention specifically to the difference in the bids as to the time in which the work should be completed, and stated that "the element of time is a very important element;  *  *  *  that this element is of vital importance." The time in which the work was to be completed was not only of vital importance to the city, but when the possible effect of the proposition contained in the specifications that a bonus of $50 per day was to be allowed and paid to the successful bidder for each and every day that each battery should be completed before

the limit of the time guaranteed is considered, it is clear it was of vital importance to the bidders. By naming a time limit in the bid much longer than would be necessary for the completion of the work a bidder could make large gains and profit from the daily bonus to which he would thereby become entitled. The proposal of the Freeman company as sealed and submitted, if accepted as written, would have secured to it a longer period of time in which to complete the work upon the second and third batteries of boilers than was asked and deemed sufficient in which to do the work by any of the other three contesting bidders. The bid of the Freeman company, before it was changed, gave it one hundred and forty days after written notice had been served that battery No. 2 could be removed in which to complete and have ready for operation the new second battery of boilers. One other bidder placed the time limit for the completion of this second battery at sixty days, another fixed it at forty and the appellee at forty-five. If the work on this second battery could have been completed by the Freeman company in forty days, it would, had its bid been accepted as first submitted, have received a bonus of $50 per day for one hundred days, or a total bonus of $5000. The proposal of the other bidders was to complete the third battery in the like number of days fixed by them, respectively, for the second battery, while the Freeman company placed the time for the completion of the third battery at one hundred and eighty days, wherein lay the possibility of receiving still greater sums to be paid by way of a bonus for the work on the third battery. By fixing a time for the completion of the work greatly in excess of the number of days which would be reasonably required to do the work, a bidder could utilize the proposition to pay a bonus of $50 for each day that the second and third batteries should be completed before the limit of time guaranteed, as a means of enhancing his profits and gains and of enabling him to make his bid for doing the work much lower than it

was actually worth, and thereby secure the contract as the lowest bidder on a proposal or bid that would entitle him to receive from the city a much larger sum for doing the work than the amounts named in the bids or proposals of other bidders. It is therefore manifest any change in the time limit for the completion of the work, made after the bid should be opened, would be unjust to other bidders and to the city.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*